UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAIME SCHMIDT, DEBRA KNOWLES, ELIZABETH SAMPSON, and RYAN HENRIOULLE,<br><br>        Plaintiffs,<br><br>    v.<br><br>SHASTA COUNTY MARSHAL'S OFFICE and JOEL DEAN,<br><br>        Defendants. | No. 2:14-cv-02471-MCE-CMK<br><br>**MEMORANDUM AND ORDER** |

Plaintiffs are three former and one current employee of Defendant Shasta County Marshal's Office ("SCMO"). Plaintiffs claim that the SCMO and their boss, Defendant Sergeant Joel Dean, violated federal and state sexual discrimination statutes in connection with their employment. Plaintiffs are three women—who allegedly were the targets of the sexual discrimination—and one man—who was allegedly terminated for refusing to participate in the sexual discrimination. The women all claim to have been regarded as good employees until Dean was promoted to sergeant, became their boss, and began harassing them. Presently before the Court is Defendants' Motion for Summary Judgment ("MSJ"). ECF No. 25. As discussed below, Plaintiffs have failed to

///

identify a genuine issue of material fact regarding the alleged sexual nature of the harassment, and thus Defendants' motion is GRANTED.

## BACKGROUND[1]

The SCMO is the law enforcement division of the Shasta County Superior Court, and is overseen by the Shasta County Marshal. Stmt. of Undisputed Material Facts ("SUMF"), ¶ 2. The SCMO provides security services for the Superior Court and also serves warrants and performs other general law enforcement functions. Id. ¶¶ 4–5. Plaintiffs are all current or former employees of the SCMO.

Defendant Dean joined the SCMO on September 21, 2005, and was subsequently promoted to sergeant on May 9, 2010. SUMF ¶ 13. He served as the only sergeant in the office until Elainea Shotwell was also promoted to the rank of sergeant on November 6, 2012. Id. ¶ 14. Subsequently, they split their supervision of SCMO personnel such that Shotwell supervised those assigned to court security, while Dean supervised those assigned to administrative functions, transportation, building and perimeter security, and field operations. Id. ¶ 15.

Following Dean's promotion, Plaintiffs Jaime Schmidt, Elizabeth Sampson, and Debra Knowles felt that the SCMO began to improperly shift its focus from court security to field operations. Id. ¶ 16. This created a divide between the "Old Timers" who preferred the court security functions, and those referred to by Plaintiffs as Dean's "Cronies" who were on board with the shift in focus. Id. Schmidt and Sampson both

---

[1] In response to Defendants' Statement of Undisputed Facts, ECF No. 25-2, Plaintiffs provided a Response to Defendants' Statement of Undisputed Facts and Further Disputed Facts, ECF No. 40-1. Defendants then made a Motion to Strike Plaintiffs' filing, ECF No. 44-2, for failure to comply with Local Rules and the Federal Rules of Evidence. They also filed a Notice of Errata, ECF No. 45, in which they sought to correct citations provided in Plaintiffs' filings. Plaintiffs subsequently filed a Motion to Strike Defendants' Notice of Errata, ECF No. 46. Because the two Motions to Strike have no bearing on the outcome of Defendants' Motion for Summary Judgment, they are DENIED.

For purposes of this Order, the Court relies on Defendants' Statement of Undisputed Facts where Plaintiffs have indicated a fact is undisputed and otherwise on the underlying evidence provided by the parties. Some of the Plaintiffs' allegations are disputed, but because the disposition of this motion is not altered by the truth or falsity of these allegations, they are included here as if they were true.

2

complained to Dean about the changes, and eventually in December 2011, Schmidt, Sampson, and Knowles filed a complaint with their union, the Shasta County Deputy Sheriff's Association ("DSA"). Id. ¶¶ 17, 20.

On January 23, 2012, the DSA circulated an anonymous survey concerning Plaintiffs' complaints. Id. ¶ 21. Despite what Plaintiffs perceived as intimidation on the part of their superiors, Plaintiffs responded to the survey. Id. ¶¶ 22–24. The DSA provided the results of the survey to the SCMO, but the SCMO determined there were insufficient specifics to investigate the complaints. Id. ¶¶ 25–26. Plaintiffs Schmidt, Sampson, and Knowles then submitted internal complaints, providing their names and alleged instances of harassment. Id. ¶ 27. After an internal investigation, the SCMO found each of the allegations contained in those complaints to be either "unfounded or not sustained." Id. ¶ 31.

### A.  Facts Concerning Plaintiff Schmidt

Schmidt was hired as a deputy marshal on October 14, 2008. SUMF, ¶ 36. In Schmidt's internal complaint, she reported "recent sexual harassment conduct by Sergeant Joel Dean" committed against her. Decl. of Melissa Fowler-Bradley, Ex. G, ECF No. 27-7. This was based on a crude, sexual comment made by Dean on two occasions. On a car ride shared by Schmidt and Dean in November, 2011, Schmidt told Dean of an instance of sexual harassment she suffered while a trainee. SUMF, ¶ 44. She told Dean that her field training officer once asked her, "Is your pussy wet?" and then asked her to have sex with him at their workplace, which Schmidt declined. Id. Later in the car ride, during a lull in conversation, Dean turned to Schmidt and asked her, "Is your pussy wet?" Id. ¶ 45. Schmidt responded, "That's not a joke," and "That's off limits, don't make me regret telling you that story." Id. Dean did not repeat the comment for the rest of the car ride. Id. However, in December 2011 Dean made the comment again to Schmidt in the squad room. Dep. of Jaime Schmidt, ECF No. 26-19, at 105. He never made the comment to Schmidt after that. Id. at 106.

///

3

In a supplement to her internal complaint, Schmidt reported "harassment, favoritism, and intimidating conduct by Sergeant Joel Dean." Decl. of Melissa Fowler-Bradley, Ex. P, ECF No. 27-16. This reported misconduct aligns with Schmidt's claims in this lawsuit that she was treated differently than other employees and denied perks that were given to other male employees. Defs.' Am. Opp'n to MSJ, at 12. For example, "[s]he was denied a modified work schedule [though] it was okay for others" and "[s]he was denied overtime in situations other deputies were receiving overtime." Id. Dean also allegedly scrutinized her work to a far greater degree than he did other employees. For example, Dean required Schmidt to prepare two "ops orders," which he then criticized. Dep. of Jamie Schmidt, ECF No. 38-3, at 161. Schmidt found this criticism unfair since requiring an ops order "was completely out of the norm" and she "had never done an ops order" before. Id. at 164.

As a result of the stress caused by this alleged sexual harassment, Schmidt went on leave on September 25, 2012. SUMF, ¶ 81. On January 13, 2014, Schmidt returned to work but then resigned on March 14, 2014. Id. ¶ 82.

### B. Facts Concerning Plaintiff Sampson

Sampson was hired as a deputy marshal on July 3, 2003. Id. ¶ 88. In Sampson's internal complaint, she reported "ongoing and pervasive harassment, intimidation and favoritism in the workplace as well as retaliation against myself by Sergeant Dean." Decl. of Melissa Fowler-Bradley, Ex. O, ECF No. 27-15. Similar to Schmidt's complaints, Sampson alleges that Dean spoke disparagingly of her and scrutinized her work more closely than the work of others. For example, Sampson was twice called into Dean's office and after she was asked to shut the door, Dean placed a tape recorder on the desk saying that how she answered his questions would determine if the tape recorder remained on. Dep. of Elizabeth Sampson, ECF No. 38-4, at 31. Sampson interpreted these actions as intimidation. Id. Dean also disparaged Sampson to Sampson's significant other, calling her lazy. Id. at 32–33.

///

Also similar to Schmidt's complaints about increased scrutiny, Dean disparaged Sampson's work on a citation, though Dean admitted in the same conversation that there was no policy on writing citations that she could have violated. Id. at 45–46. Sampson also interpreted Dean's tone as inappropriate, mainly because of Dean's use of profanity. Id. at 47. In another incident, three officers, including Sampson, failed to properly handcuff an inmate, but only Sampson was disciplined. Dep. of Richard Nance, ECF No. 38-8, at 37–38.

Unlike Schmidt, though, Sampson complains of comments Dean made about her appearance. When Schmidt went into Dean's office, he would say things such as, "What's that smell?" or "What's up with your eyes?" or "I hate it when you do that." Dep. of Elizabeth Sampson, at 104–05. Dean never repeated any of these questions or comments, saying each only once. Id. at 105. The comments made Schmidt uncomfortable. Id. at 104–05.

Sampson, too, eventually went on leave as a result of the alleged sexual harassment on October 3, 2012. SUMF, ¶ 126. She then resigned from the SCMO on September 4, 2013. Id. ¶ 127.

**C. Facts Concerning Plaintiff Knowles**

Knowles was hired as a public safety service officer ("PSSO") on December 27, 2005. Id. ¶ 128. She was subsequently promoted to deputy marshal on January 29, 2010. Id. ¶ 129. In her internal complaint, she reported "harassment/retaliation," Decl. of Melissa Fowler-Bradley, Ex. H, ECF No. 27-8, similar to Sampson.

Knowles was also subjected to increased scrutiny and allegedly unfair treatment by Dean. For example, an internal affairs investigation was initiated against Knowles for allegedly improper conduct during an off-duty radio transmission. Dep. of Joel Northrup, ECF No. 37-1, at 120–21. The investigation was ultimately dropped. Dep. of Debra Knowles, ECF No. 38-5, at 261.

Prior to Dean's promotion to sergeant, Knowles had been subjected to harassment by another SCMO employee, PSSO Gordon. SUMF, ¶¶ 130–31. Gordon

1  was ordered to refrain from the harassing conduct and orders were put in place to
2  minimize contact between Knowles and Gordon.  Id. ¶ 131.  However, starting in 2011,
3  on several occasions Knowles and Gordon were scheduled to work together or Knowles
4  was otherwise forced to interact with Gordon.  See id. ¶¶ 147–60.  Knowles was
5  embarrassed when these incidents forced her to refuse her assignment or otherwise
6  avoid interactions with Gordon.  See, e.g., Dep. of Debra Knowles, at 182–83.

7  Dean also made comments of a sexual nature to Knowles.  For example, he
8  pointed other women out to her and asked her if she found them sexy.  Id. at 89.  He
9  also at least twice rubbed her earlobe.  Id. at 88.  Knowles interpreted these actions as
10  "feeling the waters" on whether she would be interested in extramarital sex.  Id. at 89.
11  Similarly, on one occasion Dean stood very close behind Knowles while she was bent at
12  the waist searching a car.  Id. at 90–91.

13  Knowles continues to work for the SCMO, though she went on leave due to stress
14  from October 2012 until November 2013.  SUMF, ¶¶ 195–97.

15  **D.  Facts Concerning Plaintiff Henrioulle**

16  Henrioulle was hired as a deputy marshal on November 28, 2011.  Id. ¶ 198.  On
17  September 17, 2012, during a mandatory one-year probationary period, Henrioulle was
18  placed on administrative leave and then terminated the next day.  Id. ¶¶ 199, 222, 225.
19  He contends that the stated reason for his termination was pretextual, and that the real
20  reason was in response to him sticking up for Plaintiffs Schmidt, Sampson, and Knowles.
21  Defs.' Am. Opp'n to MSJ, ECF No. 40, at 42.

22  While Henrioulle was at the SCMO, Dean and others made comments that
23  implied he was effeminate.  For example, Dean once asked Henrioulle if he had "sand in
24  his vagina."  Dep. of Ryan Henrioulle, ECF No. 38-7, at 52.  Another employee referred
25  to Henrioulle as a "faggot" several times.  Id. at 54–55.  These comments caused him
26  offense.  Id. at 55.

27  Henrioulle was also asked to report on those who spoke out against Dean.  Id. at
28  64–66.  Henrioulle refused to do so, despite having the understanding that his job was

on the line. Id. at 66. Dean also asked Henrioulle to lie in relation to an incident involving Sampson. Id. at 69–70.

The ultimate reason given for Henrioulle's eventual termination was related to an incident at a San Francisco 49ers game on September 16, 2012. On that day, Henrioulle carried his department-issued firearm. Id. at 144–45. The San Francisco Police Department received an anonymous 911 call that Henrioulle had brandished his weapon at the game. SUMF, ¶ 218. The police stopped Henrioulle, detected an odor of alcohol, and administered a field sobriety test, which Henrioulle passed. Id. The police notified Dean of the incident, but let Henrioulle go since the police found the 911 call claims unsubstantiated. Id. at 219–20. Dean also told the police to let Henrioulle travel home with his firearm, which they did. Id. at 220. The next day, after reviewing the police reports related to the incident, Dean placed Henrioulle on administrative leave and then terminated him. Id. at 222, 225.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances

Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its

opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

Schmidt, Sampson, and Knowles allege violations of Title VII and California's Fair Employment Housing Act (FEHA) under a hostile work environment theory. Henrioulle alleges violations of Title VII and FEHA under a retaliation theory. In Plaintiffs' moving papers, they also argue that Henrioulle "was harassed based on male stereotypes." Pls.' Opp'n to MSJ, at 41. However, the only causes of action relating to Henrioulle in Plaintiffs' Complaint, ECF No. 1, are under a retaliation theory, and "[t]he Court will not consider claims raised for the first time at summary judgment which Plaintiffs did not raise in their pleadings." Burrell v. County of Santa Clara, No. 11-cv-04569-LHK, 2013 WL 2156374, at *11 (N.D. Cal. May 17, 2013) (citing Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292 (9th Cir. 2000)). Accordingly, any evidence that Henrioulle was himself subjected to sexual harassment is immaterial to Defendants' Motion for Summary Judgment.

///

///

### A. Hostile Work Environment

To support a Title VII claim premised on the hostile work environment theory, "the plaintiff must show that her work environment was both subjectively and objectively hostile; that is, she must show that she perceived her work environment to be hostile, and that a reasonable person in her position would perceive it to be so." Dominguez-Curry v. Nev. Trans. Dep't, 424 F.3d 1027, 1034 (9th Cir. 2005). Furthermore, "[t]o survive a defendant's motion for summary judgment, as a threshold matter, a plaintiff must show that the harassment occurred because of sex." Smith v. County of Humboldt, 240 F. Supp. 2d 1109, 1115 (N.D. Cal. 2003) (citing Oncale v. Sundowner v. Offshore Servs., 523 U.S. 75, 80–81 (1998)). California courts have adopted the same standard for hostile work environment sexual harassment claims under the FEHA. Lyle v. Warner Bros. Television Prods., 385 Cal. 4th 264, 279 (2006).

Here, though Plaintiffs may have laid out a case that Defendants created a hostile work environment, the evidence does not show the hostile work environment was created "because of sex" as required under Title VII and FEHA. When Dean was promoted, Plaintiffs believe he "began to improperly shift [SCMO's] focus from court security to field operations, thereby creating a divide between the deputies who preferred the courtroom security/bailiff duties . . . and those who supported a greater emphasis on field operations." SUMF, ¶ 16. Plaintiffs voiced these concerns to Dean, but he was not receptive to them. Defendants argue that if Plaintiffs suffered harassment, it was due to this difference of opinion. Plaintiffs have not identified any issue of material fact that would support the opposite inference, making summary judgment appropriate. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). While Defendants' harassment of Plaintiffs might have been severe or otherwise offensive, Title VII is not a "general civility code for the American workplace," Oncale, 523 U.S. at 80, and does not allow recovery by Plaintiffs under the evidence provided.

///

There are at least two methods to show that harassment occurred "because of sex." "[S]ex- or gender-specific content is one way to establish discriminatory harassment." Equal Emp't Opportunity Comm'n v. Nat'l Educ. Ass'n, Alaska, 422 F.3d 840, 844 (9th Cir. 2005).  However, Plaintiffs are correct that "[s]exual innuendo and gender-related language are not among the requirements for sex[ual] harassment." Pls.' Opp'n to MSJ, at 43.  Thus, another method of showing harassment was "because of sex" is by presenting "direct comparative evidence about how the alleged harasser treated members of both sexes." Id. (quoting Oncale, 523 U.S. at 80–81).  "The ultimate question in either event is whether 'members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" Id. (quoting Oncale, 523 U.S. at 80).

Under the first method, Plaintiffs have failed to provide sufficient evidence that their hostile workplace was due to sex- or gender-specific content.  The only incidents reasonably characterized as sex- or gender-specific are the comment Dean repeated back to Schmidt, Dean asking Knowles if she found other women to be sexy, and Dean standing close behind Knowles while she was bent at the waist.  Dean rubbing Knowles's earlobe on two occasions would also be more fairly than not described as sexual.  However, subjecting them to increased scrutiny or his general criticisms of Plaintiffs have no such sexual overtones.  Nor do Dean's comments about Sampson's physical appearance have such connotations.  While certainly comments on physical appearance often have sex- or gender-specific connotations, the ones identified by Plaintiffs here do not, even when drawing all reasonable inferences in favor of Plaintiffs.

It is also not immediately obvious whether Defendants scheduling Knowles to work alongside Gordon—someone who previously made unwanted advances toward her—would properly be described as sex- or gender-specific harassment.  In any event, Plaintiffs have provided evidence that Knowles was scheduled to work with Gordon only four times over the course of eleven months—December 23, 2011; December 30, 2011; February 28, 2012; and October 5, 2012.  SUMF ¶¶ 147, 149, 157, 189.  Furthermore,

1  Knowles had to actually work alongside Gordon only two of those four occasions, and in
2  both instances he did nothing that could be considered sexual harassment. See Dep. of
3  Debra Knowles, at 140, 159–60. The other two times, last-minute rescheduling
4  prevented all but minimal contact between Knowles and Gordon. Id. at 319–20; SUMF
5  ¶ 157. Additionally, though in one of these instances Knowles claims to have suffered a
6  "panic attack," SUMF ¶ 190, Plaintiffs have provided no evidence that such a reaction
7  was objectively reasonable. See Dominguez-Curry, 424 F.3d at 1034 ("[Plaintiff] must
8  show that she perceived her work environment to be hostile, and that a reasonable
9  person in her position would perceive it to be so."). Plaintiffs have only provided
10 evidence that Knowles found Gordon to be "creepy" and that Gordon once sent her an
11 unwanted love letter. See Dep. of Debra Knowles, at 24–25. Absent additional facts,
12 the Court cannot agree that a reasonable person in Knowles's position would perceive a
13 few minutes of contact with Gordon so severe that she would suffer a panic attack. Cf.
14 Swenson v. Potter, 271 F.3d 1184, 1195 (9th Cir. 2001) (finding even sixteen
15 interactions with a prior harasser over a fourteen-month period insufficient to be
16 considered sexual harassment, even "allow[ing] for the fact that [the plaintiff] might have
17 been particularly sensitive to contact with [the prior harasser]").
18      "To determine whether conduct was sufficiently severe or pervasive to violate
19 Title VII, [courts] look at 'all the circumstances, including the frequency of the
20 discriminatory conduct; its severity; whether it is physically threatening or humiliating, or
21 a mere offensive utterance; and whether it unreasonably interferes with an employee's
22 work performance.'" Vasquez v. County of Los Angeles, 349 F.3d 634 (9th Cir.2003)
23 (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001)). While some of
24 Defendants' conduct was sex- or gender-specific, the sexual conduct is itself not
25 "sufficiently severe or pervasive" as a matter of law to "alter the conditions of [their]
26 employment" as required under Title VII. Brooks v. City of San Mateo, 229 F.3d 917,
27 923 (9th Cir. 2000). This remains true even making all reasonable inferences in favor of
28 ///

Plaintiffs and considering as sexual all the harassment that arguably could be considered sex- or gender-specific.

Plaintiffs have provided no evidence of sex- or gender-specific harassment of Sampson, evidence of only two isolated sexual comments made toward Schmidt, and evidence of only eight instances of harassment toward Knowles that were arguably sex- or gender-specific, spread over the course of more than a year.  This falls short of the level of harassment required to prevail on a hostile work environment claim.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); Pieszak v. Adventist Med. Ctr., 112 F. Supp. 2d 970, 992–93 (C.D. Cal. 2000) (finding "fifteen to twenty different incidents over an eighteen-month period" of the defendant making sex- or gender-specific comments that "were clearly inappropriate and in bad taste" insufficient to support Title VII claim).  None of these incidents of sex- or gender-specific harassment were particularly severe, but rather were closer to "the sporadic use of abusive language, gender-related jokes, and occasional teasing" that is not actionable under Title VII.  Faragher, 524 U.S. at 788.

Instead, the harassment could only potentially be described as severe and pervasive if it included the decidedly non-sexual increased scrutiny and general antagonism between Plaintiffs and Defendants.  But the few explicitly sexual incidents Plaintiffs identify do not render all the harassment they suffered "because of sex" under this first method.  See Oncale, 523 U.S. at 81 ("Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations . . . ."); cf. Vasquez v. County of Los Angeles, 349 F.3d 634, 644 (9th Cir. 2003) ("Two isolated offensive remarks, combined with [Plaintiff]'s other complaints about unfair treatment, are . . . not severe or pervasive enough to create a hostile work environment.").  Accordingly, Plaintiffs have not provided sufficient evidence in order to survive summary judgment under the first method.

///

Turning to the second method identified above by which a plaintiff can show harassment was committed because of sex, Plaintiffs have also failed to meet their burden of proving "direct comparative evidence about how the alleged harasser treated members of both sexes." Nat'l Educ. Ass'n, 422 F.3d at 844. While at times Plaintiffs contend that males were not treated the same way they were, see, e.g., Pls.' Opp'n to MSJ, at 12 ("[Schmidt] was not given compensating time off but it was okay for the males."), they nonetheless fail to make the relevant comparison. That is, they fail to present comparative evidence of how men who criticized Dean's leadership were treated versus how women who criticized Dean's leadership were treated. Instead, they only provide speculation that they would have been treated differently if they had not been women, e.g., Dep. of Jaime Schmidt, at 99–100, which is insufficient to survive a motion for summary judgment. In fact, Plaintiffs' own arguments contradict a theory based on disparate treatment because of sex. Plaintiffs contend that Henrioulle, too, a male employee, was treated harshly and subjected to increased scrutiny because he associated with Schmidt, Sampson, and Knowles, resisted Dean's vision for the SCMO, and refused to aid Dean in identifying those who questioned Dean's leadership.

Therefore, Plaintiffs have failed to provide sufficient evidence to survive summary judgment that Defendants harassed them because of sex. In opposition to Defendants' Motion for Summary Judgment, Plaintiffs thoroughly catalogue the harassment they suffered, but they fail to identify specific facts or provide a legal theory to support a finding that the harassment was because Plaintiffs are women.[2] Assuming all of Plaintiffs' allegations are true, Dean's behavior was potentially sufficiently severe and pervasive under the standards of Title VII and FEHA (a question that need not be

///

---

[2] The closest Plaintiffs come to proposing a legal theory under which the harassment was because of sex is their argument that "[i]t is only necessary to show that gender is a substantial factor in the discrimination," coupled with declarations from several non-party employees providing that Dean referred to certain (sometimes unspecified) women as "bitches." Pls.' Opp'n to MSJ, at 42–43. In doing so, they rely on Birschtein v. New United Motor Mfg., Inc, 92 Cal. App. 4th 994 (2001). However, that case concerned the sufficiency of pleading a hostile work environment sexual harassment suit and thus is of limited relevance in analyzing the current motion for summary judgment.

reached by the Court here), the absence of evidence that the harassment was carried out because of sex requires summary judgment to be granted in favor of Defendants.

**B.	Retaliation**

"Employers may not retaliate against employees who have 'opposed any practice made an unlawful employment practice' by Title VII." Davis v. Team Elec. Co., 520 F.3d 1080, 1093 (9th Cir. 2008) (quoting 42 U.S.C. § 2000ee-3(a)). "The elements of a prima facie retaliation claim are, (1) the employee engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action." Id. at 1093–94 (citing Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002)).

Plaintiffs' claim fails because Plaintiffs have not shown that Defendants engaged in any practice made unlawful by Title VII.  Henrioulle certainly suffered an adverse employment action in being terminated, and perhaps Sampson and Schmidt suffered a constructive termination.  However, any causal link between those adverse employment actions and Dean's harassment is immaterial under Title VII because, as described above, Dean's harassment was not unlawful under Title VII.  Similarly, even if Dean's harassment was a direct result of Plaintiffs' March 2012 internal complaints, any alleged sexual harassment in those internal complaints were not "sufficiently severe or pervasive" to be considered unlawful under Title VII.

///
///
///
///
///
///
///
///
///

**CONCLUSION**

For the reasons provided above, Defendants' Motion for Summary Judgment, ECF No. 25, is GRANTED. The matter having now been concluded in its entirety, the Clerk of Court is directed to close the file.

IT IS SO ORDERED.

Dated: February 21, 2017

_____
MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE